RAILROAD COMMISSION OF TEXAS
et al., Appellants,

v.

SUN OIL COMPANY, Appellee.

No. 10479.

Court of Civil Appeals of Texas.

Austin.

May 8, 1957.

Rehearing Denied May 22, 1957.

Will Wilson, Atty. Gen., James N. Ludlum, 1st Asst. Atty. Gen., James W. Wilson, Asst. Atty. Gen., for appellant.

Joiner Cartwright, Charles F. Heidrick, John H. Benckenstein, Beaumont, for appellee.

ARCHER, Chief Justice.

This suit was instituted by Sun Oil Company, appellee, against the Railroad Commission of Texas and its members, appellants, seeking to set aside an "order" of the Commission and to enjoin the Commission and its members from taking any action under the "order" against Sun Oil Company, authorized by Section 20 of Article 911b, V.A.C.S.

The appeal is before this Court on four assignments and are to the effect that it was error to hold the November 14, 1955, finding of the Commission is declaratory and has an immediate and practical impact on Sun Oil Company, to hold that the Commission was without jurisdiction to determine the character of the movements of pipe and tubular goods in Texas, and that such order invaded the jurisdiction of the court, in holding that the order was not supported by substantial evidence, and in holding that the movements of pipe and tubular goods from storage yards in Texas to drilling sites are in interstate commerce.

Appellee has made six counterpoints and they are that since the trial court having concluded that the material allegations are true, that this Court will presume such findings true in the absence of a request for and findings by the trial court; that the action taken by the Commission is a decision, order, etc. appealable to the District Court under Section 20 of Article 911b, V.A.C.S.; that such order, etc, is final; that the finding by the Commission that it was well within its jurisdiction to regulate the traffic inquired about is appealable as a final order; that appellee was not required to await a further regulatory order of the Commission before contesting its jurisdiction in this matter; that the decision, etc. adopted by the Commission is declaratory and not abstract.

General Order No. 99, in part is as follows:

"On March 31, 1955, the Railroad Commission of Texas took up for consideration the matter of practices certain motor carriers are engaged in, who are subject to the jurisdiction of the Railroad Commission of Texas.

"The Commission Finds from its own investigation that certain motor carriers were hauling pipe and tubular goods in intrastate commerce on interstate rates, all of which is in violation of tariffs as prescribed by the Railroad Commission of Texas on such commodities.

"The Commission Further Finds that pipe and tubular goods shipped into Texas via barge, boat, trucks or railroads, when reaching its destination as indicated on the bill of lading and having come to rest after an interstate movement, if it is placed in bulk storage, storage and transit yards or warehouses awaiting further shipment, if, when and where needed, transportation out of this storage to a point in Texas, the route being wholly within the State of Texas, is in *intrastate* commerce, Accordingly, it is

"Ordered by the Railroad Commission of Texas that such shipments shall move on rates as prescribed by

tariffs issued by the Railroad Commission of Texas."

On May 11, 1955, a petition was filed by the Oilfield Haulers Association requesting the Commission to set order No. 99 down for a hearing to determine the jurisdiction of the Commission. A hearing was set for August 16, 1955, and notice was given to all specialized motor carriers holding permits to transport oilfield equipment, pipe and tubular goods in intrastate commerce. Sun, not being such a carrier, was not given a notice.

In response to the Commission's subpoena duces tecum, the District Traffic Manager of the Gulf Coast Division, Sun Oil Company, appeared, testified and produced certain records as to the nature of shipments of the commodities in question.

On November 14, 1955, the Commission issued the order here in question reciting that the traffic bore the characteristics of interstate shipments and that the Commission was well within its jurisdiction to regulate the traffic.

The finding is as follows:

"Findings of Fact made by the Railroad Commission of Texas in hearing held August 16–17–18, 1955, in connection with General Order No. 99 to determine jurisdiction of the Railroad Commission of Texas.

"Plaintiff's Exhibit No. 6

"Austin, Texas
"November 14, 1955

"On March 31, 1955, the Railroad Commission of Texas, in regular conference, issued, as prescribed by law, General Order No. 99.

"The Oilfield Haulers Association of Texas on May 11, 1955, filed a petition with the Railroad Commission of Texas requesting the Commission to set such order down for a hearing to determine the jurisdiction of the Railroad Commission of Texas.

"On August 16–17–18, 1955, pursuant to statutory notice, a hearing was held at which time evidence was presented by the Chief Inspector of the Railroad Commission of Texas on shipments covered by General Order No. 99.

"From the evidence, as presented by the Chief Inspector, covering shipments made by the Gulf Oil Corporation, the Commission finds that interstate shipments tendered Texas Carriers by such company bore definite characteristics of interstate shipments, and it is the opinion of the Railroad Commission of Texas that it has no authority to regulate the rates on such shipments.

"Furthermore, evidence presented by the Chief Inspector of the Railroad Commission of Texas covering shipments tendered by the National Supply Company, Humble Oil & Refining Company, Mid-Continent Supply Company, Bethlehem Supply Company, Sun Oil Company, Magnolia Petroleum Company, The Texas Company and Oilwell Supply Company, indicate that the shippers through devious methods have attempted to clothe their shipments in the characteristices of interstate to secure the cheap rate, and the carriers, through the use of an in-transit tariff on file with the I. C. C., have accepted these shipments without full explanation as to their characteristics. All of which indicates a possible subterfuge to evade the intrastate application of rates as set forth in Tariff 6–C as prescribed by the Railroad Commission of Texas for intrastate shipments.

"Therefore, it is the opinion of the Railroad Commission of Texas that the above-mentioned shippers' traffic as presented in said hearing definitely bore the characteristics of intrastate shipments and the Railroad Commission of Texas is well within its ju-

risdiction to regulate same, and General Order ·No. 99 is hereby re-affirmed."

This case·went to·trial upon plaintiff's verified petition and defendant's general denial, and the Court heard the stipulation of facts, the testimony of the Chief Inspector of the Commission and of the·Assistant Traffic Manager of Sun Oil Company, and found the material allegations of plaintiff's petition to be true.

No findings of fact were requested **or** made outside of the court's judgment.

■ We recognize the well established rule of law in this State that when no findings of fact have been requested or filed that an appellate court must assume that the trial court correctly found all fact issues having support in the evidence in favor of the judgment rendered. Rules 296, 298 and 299, Texas Rules of Civil Procedure; Bostwick v. Bucklin, Tex.Civ. App., 190 S.W.2d 814; affirmed by the Supreme Court 144 Tex. 375, 190 S.W.2d 818.

■ It is also the established law in this State that in nonjury cases, the trial court's judgment must be affirmed if there is proper evidence in the record to support the judgment rendered on any theory. Gray v. Luther, Tex.Civ.App., 195 S.W.2d 434, er. ref.

Bearing in mind the foregoing rules of law we will consider the case on its merits as well.

■. We believe that the action taken by the Commission on November 14, 1955, hereinabove set out, is a decision, rule or order as is contemplated under Section 20 of Article·911b, V.A.C.S; and is therefore appealable. An appeal was taken and on trial the court held that the pipe and tubular goods were shipped from the millsite at Aliquiffa,·Pennsylvania, by rail and barge lines to Houston, Texas, where the same was placed in transit storage with; the T.,E.

Mercer Trucking Company, Specialized Motor Carrier, and kept until ordered out by Sun Oil Company and delivered to oil well sites at points in Texas, were in interstate shipment and all carriers were paid the rates published in Tariffs on file with the Interstate Commerce Commission.

■ We believe that the shipments of pipe and tubular goods from storage yards in Texas to drilling sites or other locations in Texas are in intrastate commerce, and that the Commission had jurisdiction to make a determination of the character of the commerce.

The evidence in this case relating to the interstate or intrastate character of the shipments is found primarily in the stipulation entered into between the parties and the appendices thereto, where purchasing and shipping procedures are typical of these in issue.

The record in this case while not unduly long is one of intricate and complicated nature.

Appellee is engaged in discovery, production, refining and marketing of petroleum and by products. It drills many wells and purchases large quantities of tubular goods from manufacturers for its use, and at the time purchase is made appellee intends that such goods will ultimately be used in its drilling programs, and begins the shipments from the steel mills with this intention.

Purchases are made through its central office according to the predicated requirements of its several divisions, and are made from 30 to 90 days prior to the drilling quarter and to meet the manufacturer's schedules, such requirements are derived from the estimates of the Geological and Land Departments of each division, are projected into the future, and may be brought up to date at intervals.

The Division Material Expediter who is responsible for the tubular requirements of such division, prepares a casing pro-

gram upon which orders will be based. The program in the record was prepared April 1, 1955, and reflects the division's requirements of pipe from that date through the third quarter of 1955, shows the need of each well during the period, the total determines the gross footage of each kind of pipe needed, and the requirements are shown.

A requisition is made to the coordinator of purchases, showing the net needed pipe to fulfill the program. The coordinator issues a consolidated sheet based on the drilling programs and orders are placed. Each order accepted by a mill is given a purchase order number which follows the pipe until it is delivered to the drilling site.

Apparently the coordinator allocates the tubular goods among the several divisions, and issues shipping instructions to the manufacturer directing the disposition of the pipe, and that allocated to the Gulf Coast Division is shipped by barge to Houston, Texas, to which a shipping notice is issued showing the consignee to be Sun Oil Company, destination Houston, Texas. When the coordinator of purchases receives the shipping notice he advises T. E. Mercer, the Specialized Contract Motor Carrier, in Houston of the estimated arrival of the barge, and requests the carrier to "rack and store, the shipment for account of Sun Oil Company." The carrier unloads the shipment and bills Sun for this service. The pipe is marked to show the barge from which it was removed and its ownership. The pipe is retained in storage until needed at a drilling site, and the length of time the pipe stays in storage varies from a few days to a year or more.

When pipe is needed in the field the Material Expediter issues instructions to the carrier to move a certain quantity of specified kind of pipe to a designated location in the field, and the trucks make delivery and Sun is billed for the charges.

The shipment by the barge company, the storage service and the shipment from storage to the well site are each on a separate contract.

While the pipe is in storage monthly inventories are made by the carrier to the coordinator of purchases as to the stock on hand, and approximately 70% of the tubular goods is used in accordance with the original program and 30% is diverted from the original plan because of changed conditions and is otherwise disposed of.

Sun Oil Company does not know the destination of any particular joints of tubing until such is actually ordered out of storage in Houston for a specific location in the field. .

It appears that in dealing with various assertions of State or Federal power in the commerce field that decisions are not particularly determinative. There are decisions dealing with activities here in question as would affect commerce within the meaning of the Labor-Management Relations Act, 29 U.S.C.A. § 141 et seq., or would constitute engagement in interstate commerce within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., or are within the scope of various federal laws. Walling v. Jacksonville Paper Co., 317 U.S. 564, 565, 63 S.Ct. 332, 87 L.Ed. 460.

■ Generally the question of whether a particular shipment within a State is an independent, intrastate movement, or part of a continuous interstate shipment is governed by the intentions of the shipper and the nature of the shipment as indicated by the circumstances of the shipment itself, and it is on the principle of intention that appellee relies greatly.

■ ■ We believe that a shipment from the mills in the east consigned to appellee in Houston, Texas as its destination is a complete movement; was broken, and has come to rest and that later shipments of the same or part of the original goods to

other places designated are in intrastate commerce.

15 C.J.S. Commerce § 25, p. 292; Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; Baltimore & O. S. W. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189; Southern Pac. Co. v. Van Hoosear, 9 Cir., 72 F.2d 903. Galveston Truck Line Corporation v. State, Tex.Civ.App., 123 S.W.2d 797, er. ref., is a case closely in point.

We believe that the finding of the Commission is reasonably supported by substantial evidence heard by the Commission and in the record in this case, and as has been so many times stated the courts shall not substitute its judgment for that of the Commission.

The judgment of the trial court is reversed and judgment rendered for appellant.